WM. H. POLLETT v. DENVER & R. G. W. R. CO., and
B. P. DELONG
A. E. POLLETT v. DENVER & R. G. W. R. CO.

Nos. 5151, 5152.  Decided October 14, 1933.  (25 P. [2d] 963.)

*Willard Hanson* and *A. H. Hougaard,* both of Salt Lake City, and *Sterling K. Heppler,* of Richfield, for appellants.

*Van Cott, Riter & Farnsworth,* of Salt Lake City, for respondent.

STRAUP, Chief Justice.

Two actions were brought against the railroad company arising out of the same transaction; one by W. H. Pollett, a minor, for personal injuries, the other by the father, A. E. Pollett, for damages to a truck owned by him and driven by the minor at the time of the accident, which injury and damage were alleged to have resulted through the negligent operation of an engine and coach by the company at its depot and grounds at Richfield, Utah. The two cases were consolidated and tried together. At the conclusion of the evidence adduced on behalf of the plaintiffs and of the company, the court on the request of the latter directed a verdict in its favor and against both plaintiffs, no cause of action. Both plaintiffs separately appeal. The two appeals are submitted on a combined transcript of the record on appeal. The assignments challenge the rulings directing the verdict. While the appellants' brief as one brief is designated as a brief in both cases, yet it is devoted chiefly, if not entirely, to the cause of the minor, who was about 15 years of age at the time of the accident. In other words, the case is presented on the theory that if the verdict was properly directed in the minor's cause, it also was properly directed in the father's. We will so consider the matter.

The company at Richfield owns and maintains a depot and surrounding grounds. The depot or building extending substantially north and south is about 70 feet long and about 25 feet wide. The north portion of the building is used as a warehouse. The main railroad track is immediately east of the building and also extends in a northerly and southerly direction. Between such track and the building is a plat-

form about 15 feet wide extending from the building to the railroad track, which platform extends about 60 feet north of the building and about 20 feet south of it. There is also a raised platform about 10 feet wide at the north end of the building. On the west side of the building is what is called a house track extending in a northerly and southerly direction, and west of that track a side track extending in the same direction. About 70 feet north of the depot or building and on the company's premises are two plank crossings, each 16 to 18 feet long, put there and maintained by the company; one a crossing over the main track, and the other over the house track. A short distance south of the building are two other plank crossings, also put there and maintained by the company; one over the main track and the other over the house track, and still other plank crossings farther to the south. The depot is located near the intersection of two streets of the city. Leading from the intersection and over grounds and premises of the company is a driveway in a northerly direction west of the building and between the house track and the side track, then easterly over the plank crossings north of the building, thence southerly and east of and near the main track to the plank crossing south of the building, all on grounds and premises of the company used as a part of its depot and station. About 120 feet south of the building and near the west side of the main track the company also maintained a water tank to supply engines with water.

The father, A. E. Pollett, was and for some years had been engaged in the express business, hauling trunks, baggage, and merchandise to and from the depot for passengers and shippers over the company's railroad, and carrying mail to and from the station. In doing that, his son at intervals assisted him. Both for years were familiar with the conditions and surroundings of the depot and premises, and with the operation of trains and cars at and about the depot grounds. On the afternoon of the day in question in November, a clear and quiet day, the father, accompanied by his

son, with an automobile truck, took a trunk to the depot to be shipped to Nevada. In going to the depot they drove along the driveway west of the depot and between the house and side tracks, and over the plank crossing of the house track, backed up at the north end of the depot, the warehouse portion, and unloaded the trunk. After attending to that, the father directed the son to drive the truck to a building of an oil company, located about 140 feet southeasterly of the building or depot and about 60 feet east of the main track, to get barrels or drums to be brought to the depot or warehouse for shipping, the father stating he would walk to the oil building, while the boy drove around. Where the truck stood at the north end of the building and where the boy was his view to the south, because of the building, was obstructed. When he started up with the truck he testified he looked around but could not see far to the south, and drove in a northerly direction along the extended platform, intending to cross the main track easterly at the plank crossing about 70 feet north of the building, then southerly to the building of the oil company, which, as the boy testified to, was the usual and customary way of travel. The boy's movements as he started up and drove along, are perhaps best described by himself. On direct examination he in substance testified:

"When we came out of the warehouse, my father told me to drive to the Shell Oil and he would walk over. We were going to get some oil drums. I was standing on the platform, and I looked around and got into the truck. I was standing on that part of the platform called the ramp, on the elevated part of the platform. I couldn't see very far along the main line because of the depot. There was nothing in sight at that time. I also looked up the track towards the north, then I got into the truck and started the motor. I heard nothing of any bell or of any whistle, and I didn't know that there was any engine or tender or caboose on the track, nor any by the water tank. I started north in low gear and then made the turn to go east to cross over the crossing. As I was going northerly, I was looking ahead, and as I proceeded east I was looking back to make sure that I would not hit the corner of the platform; that is, the platform that is practically level with the track. I was looking at the northwest corner

of this platform, which is practically on a level with the track. It is possibly a foot and a half above the ground. Then I proceeded up towards the crossing.

"I did not hear any bell or any whistle of any kind, and if any bell had been ringing or whistle blowing I think I would have heard it. I had not seen any part of the train up to the time it hit me. I was driving in low gear, going possibly 4 miles an hour. When I was on the crossing I felt something hit me, and when I crawled out I could see it was the train. I recall that the truck was shoved down the track. When the train stopped I was between the rails underneath the wreckage of the truck."

### On cross-examination he testified:

"I had been going down to the railroad station with my father for about three years prior to this accident, and I had been helping him in running this express business. When school wasn't on I would help him the entire day. I was familiar with the depot and with all of the crossings, and I had been there frequently. My father would get express at the depot. He would also get the mail. I had driven the truck or some automobile occasionally for two or three years, but it had always been in the presence of my father. Just before I got into the truck I was standing at the place where you have marked the cross on the ramp, a little bit northerly and westerly from the place indicated 'guy pole' and it was from there that I looked around before I got into the truck. I was looking to see if there was any train. I knew that the beet run was on and that it might move along the track.

"A great deal of the track south of me was obscured by the depot, and I knew that the beet train might be on that track where I could not see it. If I had walked over to the east edge of the elevated platform and looked to the south and to the north I could have seen along the track a long distance.

"After I got into the truck I looked north to see if a train was coming. After the truck started moving I was watching the road in front of me. I had to watch the corner to see if I could make the turn. I went about 60 feet before making the turn. I did not look to the south. I could not have done so while the car was going. I could have turned my head and looked through the rear window. After the truck got straightened out, after making the turn I was not over 10 feet from the crossing. I did not look south at that time. I did not stop the truck at any time. I could have stopped and looked south if I had felt inclined. I had not seen the beet train equipment at the water tank that day, nor any other day that year. I had seen it other years. At the speed I was going I could stop within two or three feet. I think the left window of the truck was open and the

right one closed. The truck was making some noise but not a great deal. There was more than one way that we could have gone to the Shell Oil Company. I had known the position of the main line track for six years."

At the time the boy started to drive away from the depot, an engine facing south with a tender and an empty coach or caboose attached to it, was on the main track at the water tank, the engine being supplied with water or just had been supplied, and was about to back up or was backing up on the main track to the north and towards the crossing about 70 feet north of the depot and over which the boy intended to cross. Some of the witnesses on behalf of the plaintiff testified that the boy started to leave the depot at about the same time the engine with the tender and coach started to back up towards the crossing. When the boy started to leave the depot, the train to the south was not visible where he then was or where the truck was standing, unless he stepped to the east past the building, where he had a clear view to the south and of the train at the water tank or leaving and backing up. So, too, the father, when he directed the boy to drive away with the truck, could have observed the train by stepping 10 or 15 feet around the corner of the building. After the boy had driven away and had gone about 40 feet to the north, he, through the back window of the truck, had he then looked, had a view of the main track south to the water tank. Likewise, after he had gone farther north and about even with the plank crossing 70 feet north of the building and turning to the east to pass over the crossing about 20 or 25 feet away, he, through the side window of the truck, also had a clear view of the main track to the south, and of the approaching train then only about 50 feet from the crossing; but as testified to by him, after he got in the truck and drove away, he at no time looked back or to the south for an approaching train or cars nor did he do so as he turned and was about to drive over the crossing, for the reason, as testified to by him, his attention was directed to the handling of the truck and in

making the turn looking toward the rear of the truck to see that it did not strike against the platform about a foot and a half high and extending to the north within a few feet of the crossing.

The negligence charged against the company was that in backing up the train, consisting of an engine, a tender, and an empty coach in advance, from the water tank on the main track past the depot and approaching the crossing to the north, it was the duty of the train crew to give warning of their approach by sounding the whistle or ringing the bell on the engine, and to have some one stationed on the rear of the coach or caboose to observe a lookout and give warning to the engineer of any one approaching or about to pass over the crossing or otherwise in close proximity of the track, and that such duty was in no particular performed. Evidence was given to show that the boy was driving in low gear at a speed of about three to four miles an hour, and that the train backed up at from five to ten miles an hour; that the speed of the train as it approached was not slackened, and struck the cab of the truck on the crossing and shoved or carried the truck about 50 feet, and when the train stopped the end of the coach or caboose was on the truck and the boy underneath between the rails permanently injured. Evidence also was given to show, and as to that there seems to be no conflict in the evidence, that as the train left the water tank and was backing up towards the crossing no whistle was sounded or bell rung; that the engineer and fireman were on the engine, the head brakeman on the cowcatcher of the engine facing south with his back to the north, the conductor in the depot, and no one on the rear of the coach or caboose. The boy, not quite 15 years of age, was a bright and an intelligent boy of his age, frequently assisted his father in his business at and about the depot, and was familiar with the conditions and surroundings, and had frequently operated the truck and other motor vehicles when accompanied by his father. At different times he was warned and cautioned by his father that in approaching

railroad crossings to observe a careful lookout for approaching trains and cars. When the train reached or was passing the depot, the father, seeing the perilous situation, shouted to the boy and tried to attract his attention, but was unable to do so or make the boy hear him.

The pleaded defense, in addition to a general denial, was: (1) Contributory negligence of the minor in not looking or listening for approaching trains and cars; and (2) because the truck was driven by a minor under 16 years of age in violation of the statute, Comp. Laws Utah 1917, § 3982, as amended by Laws of Utah 1921, c. 83, p. 235, forbidding any person under 16 years of age from operating any "vehicle or tractor upon any highway of this state," which, as alleged, rendered both plaintiffs per se guilty of negligence. The motion to direct the verdict was based on both such grounds. The verdict was directed on the first but not on the second ground. Of course, if it was improperly directed on the first and ought to have been directed on the second ground, the ruling nevertheless should be upheld. If on a review the conclusion is reached that the verdict was properly directed on the first ground, it may not be necessary to consider whether it ought to have been directed also on the second ground.

What with respect to the first ground chiefly divides the parties is this: By the appellant it is contended that the plaintiff, the minor, was an invitee about the premises of the company and as such it owed a duty to use reasonable and ordinary care to observe a lookout and give warnings of the movements and operations of cars in and about the depot and premises, a duty similar to that owing a passenger or an intended passenger about depot premises, and that the plaintiff like a passenger or an intended passenger was not as matter of law required to look or listen for approaching trains or cars while so rightfully on the premises of the company; and whether in such particular the minor was guilty of negligence in failing to discover the approaching train, was a question of fact and not of law. That in the

main is disputed by the company by urging that the plaintiff was a mere licensee, and though it be held he was an invitee and rightfully about the premises, yet in crossing or going upon railroad tracks, or in going in such close proximity thereto as likely to be struck by trains or cars, he was in duty bound to look and listen for their approach, and, if he failed to do so, he was guilty of negligence as matter of law; and that the duty and care owing by the company to an invitee is not to be measured by the duty or care owing a passenger or an intended passenger in and about depot premises of the company.

First as to the relation between the minor and the railway company. The respondent urges that when the trunk was unloaded at the depot and the father and son ready to depart, that mission was ended, and after that they were about the premises of the company as mere licensees for their own convenience and business in which the company had no interest; that the direction which the father gave the boy to drive to the building of the Shell Oil Company for drums to be brought to the depot for shipping, and the boy on such mission at the time of the collision, created a relation, if any, between them and the Shell Company, but not as between them and the railway company; that the relation between them and the latter company was no different than had the father and son after unloading the trunk driven away to go home or to their place of business, in which case, it is argued, they could have gone over the same route they came to the depot, without the necessity of crossing the main track on which the collision occurred. It is not made to appear whether the building of the oil company is on ground or premises owned or used by the railroad company for railroad purposes at and about the depot and station grounds. However, since the accident did not occur there, but on premises of the railway company, the particular location of the building of the oil company may not be of controlling importance in determining the relation between the minor and the railway company. If the minor

under the circumstances in taking the trunk to the depot to be shipped by the railway company, a mission in which both were mutually interested, was an invitee, something more than a mere licensee, and for such purpose rightfully about the premises, then it would seem he was also an invitee and rightfully about the premises while and during the time he was leaving the premises, whether leaving them with the intent to go home or back to his place of business or to get further merchandise to be shipped over the respondent's road. That in doing so he may not have chosen the safer route would not affect the relation, but the question of care exercised or to be exercised by him, unless he chose a route or course he had no right to take, or when injured was at a place where he had no right to be. But the boy testified he took the usual and customary way of travel. In leaving the depot where the truck was after unloading the trunk, the boy was required to drive to the north about 70 feet, and whether he then drove west and pursued the route taken in going to the depot or drove to the east as he attempted to do, he either way was required to drive over railroad tracks; and in leaving the premises it was about as convenient to drive the one way as the other.

We thus are of the opinion that the minor was not a trespasser nor a mere licensee, but an invitee and rightfully in and about the premises when and where the collision occurred; and, being such invitee, the company, in the operation of its engines and trains, owed him the duty to use reasonable and ordinary care in observing a proper lookout and giving timely warning or signals of the approach of the train. *Smalley* v. *Rio Grande West. R. Co.,* 34 Utah 423, 98 P. 311; 22 R. C. L. 919-921; 52 C. J. 611-615; 3 Elliott on Railroads (3d Ed.) § 1786; *Wilson* v. *Union Pac. R. Co.,* 107 Neb. 111, 185 N. W. 406.

That the evidence is sufficient to justify a finding that such duty was not performed and that the company was guilty of negligence in such particular is clear enough. As to that there is no substantial conflict in the evidence. The

serious question is that of the claimed contributory negligence of the minor in not looking and listening in both directions for the approach of engines or trains before attempting to drive over the crossing where he was struck by the approaching train. In such respect, it is contended by the appellant that in principle the case comes within the rule announced by this court in the case of *Brown* v. *Union Pac. R. Co.*, 76 Utah 475, 290 P. 759, where it was held that one, a passenger of a railroad company, required to cross its tracks, may assume that the company will so operate its trains as not to put him in peril; that he is not under the same obligation to look out for his own safety by looking and listening as is incumbent on a traveler approaching a railroad crossing with intent to cross it; and that it is not per se contributory negligence for a passenger in passing from a depot to a train, or vice versa, to cross intermediate tracks without looking or listening or ascertaining whether a train is approaching, and that the question of his care or negligence ordinarily is one for the jury, under all the facts and circumstances of the case. In such particular this court approvingly adopted the rule announced by the Supreme Court of the United States in the case of *Warner* v. *Baltimore & O. R. Co.*, 168 U. S. 339, 18 S. Ct. 68, 70, 42 L. Ed. 491, that:

"The duty owing by a railroad company to a passenger actually or constructively in its care is of such a character that the rules of law regulating the conduct of a traveler upon the highway when about to cross and the trespasser who ventures upon the tracks of a railroad company are not a proper criterion by which to determine whether or not a passenger who sustains injury in going upon the tracks of the railroad was guilty of contributory negligence. A railroad company owes to one standing towards it in the relation of a passenger a different and higher degree of care from that which is due to mere trespassers or strangers, and it is conversely equally true that the passenger, under given conditions, has a right to rely upon the exercise by the road of care; and the question of whether or not he is negligent, under all circumstances, must be determined on due consideration of the obligations of both the company and the passenger."

While there is abundant authority that passengers, intended passengers, and those at and about the arrival and departure of trains to meet or see passengers off, are not per se guilty of negligence in crossing intermediate tracks without looking or listening for approaching trains and cars, still the further question is as to whether the same rule applies to invitees not passengers or intended passengers rightfully about station premises of a railway company for a necessary and customary purpose of conducting or transacting business in which the railroad company itself is interested, such as delivering or receiving mail, baggage, or merchandise, carried or to be carried by the railroad company. In support of the contention that the same rule applies, the appellant chiefly cites and relies on the cases of *Atchison, T. & S. F. R. Co.* v. *McElroy*, 76 Kan. 271, 91 P. 785, 787, 13 L. R. A. (N. S.) 621, 123 Am. St. Rep. 134; *Banderob* v. *Wisconsin Cent. R. Co.*, 133 Wis. 249, 113 N. W. 738; *Louisville & N. R. Co.* v. *Miller*, 134 Ky. 716, 121 S. W. 648, 135 Am. St. Rep. 433; *Smith* v. *Cleveland, C., C. & St. Louis R. Co.*, 67 Ind. App. 397, 117 N. E. 534, and *Chicago, R. I. & P. R. Co.* v. *Amedon*, 161 Ark. 310, 256 S. W. 52.

In the McElroy Case a boy 11 years of age was sent by his father, who was engaged in business at the place, to deliver a package of merchandise to a passenger on a train on a side track. After delivering the package, the boy, on returning to the station platform and in crossing railroad tracks without looking or listening, was struck by an incoming train. Among other things the court said:

"The plaintiff and other persons there were under no duty or obligation to anticipate and guard against negligence on the part of the railroad company. They had the right to feel secure from injury on account of passing trains. They might rest upon this feeling of security until warned or notified of danger. The ordinary rule of 'look and listen' has no application to such a situation. When a railroad operates a train under such circumstances, it assumes the peril."

In considering the case, it is apparent the court regarded the boy in a situation similar to that of a passenger or as one at and about depot premises to meet or see passengers on the arrival or departure of trains, and for such reason it was held the boy in crossing railroad tracks in going back to the depot platform was not per se guilty of negligence in failing to look or listen for approaching trains.

More remote is the Banderob Case. There the person injured came upon the platform or depot grounds to take leave of a friend who was a passenger or in good faith to become a passenger, and tripped over a wire and was injured. The principal question there considered was as to whether the company owed him a duty to keep the premises in a reasonable safe condition. The holding was that the injured person was not a trespasser, and that the company owed him the duty of ordinary and reasonable care to keep the premises in such a condition. The question of contributory negligence of the injured party seems not to have been involved, or at least was not the controlling question.

In the Miller Case the injured person was an employee of the company. On leaving his work and walking along a track he, near the depot grounds, stepped on another track without looking or listening and was struck by a train operated at an excessive speed and without warning. The holding was that the employee was not per se guilty of negligence, and that the question of his care or negligence was one of fact for the jury. Among other things, the court said:

"Where a railroad company omits its duty to run at a reasonable rate at a station, keep a lookout, and give warning of the approach of trains, and a person, who relies on the presumption that, the track is safe, steps thereon and is struck by a train, the primary negligence is on the part of the railroad company, and it cannot be exonerated if he exercised such care as may be reasonably expected of an ordinarily prudent person under the circumstances."

It, however, is to be observed the court there further stated:

"The rule 'stop, look, and listen' has not been adopted in this state. On the contrary, we have uniformly held that at places like this it is a question for the jury whether the traveler exercised ordinary care where the train is run at a dangerous rate of speed, or timely warning of its approach is not given, or a proper lookout is not maintained."

But in this jurisdiction the doctrine of "look and listen" prevails and has become a rule of law, not merely a rule of evidence, that a traveler in approaching a railroad crossing is required to look and listen before attempting to cross it. *Clark* v. *Union Pac. R. Co.*, 70 Utah 29, 257 P. 1050; *Teakle* v. *San Pedro, L. A. & S. L. R. Co.*, 32 Utah 276, 90 P. 402, 10 L. R. A. (N. S.) 486, and other cases hereinafter referred to and cited by the respondent. The particular question here is as to the application of the rule to the case in hand.

The case of *Smith* v. *Cleveland, C., C. & St. Louis Ry. Co.*, supra, cited by the appellant, seems to lend some support to his contention. The opinion was in a jurisdiction, by the Appellate Court of Indiana, where the doctrine of look and listen prevails, and in a case where an invitee not a passenger or intending passenger was involved. On the day the invitee met his death he had gone to the station to ship a case of eggs over the company's road, and crossed from the depot over a double track to a cinder platform where he deposited the case of eggs and then recrossed the double track to the depot. As he was about to leave, he learned an eastbound train was coming in and decided to wait for a milk can which he expected on that train. As such train approached, he stepped out on what was called the north track where he stood talking with another. As the train was coming in he went back to the platform at the depot where he remained until the train was about to depart, and then started to cross over the double track to the cinder platform for the milk can. When he reached the north track he stopped for the train to pull by, and while doing so he called

to an acquaintance and waved, at him on the moving train, and was struck and killed in an effort to leave the north track by the approach of a west-bound train at an excessive speed and without warning. The court held the deceased was not a trespasser, and that he was rightfully about the premises; that the company owed a duty to use ordinary and reasonable care for his safety and to all those rightfully about the depot, and while the deceased was required to exercise reasonable care for his own safety commensurate with the dangers of which he had either actual or constructive knowledge, yet whether he exercised or failed to exercise such care was a question of fact for the jury.

It again is evident the court regarded the deceased, though not a passenger, yet in a situation about the depot premises where passengers were boarding or detraining trains and crossing tracks to and from the depot premises, and hence was in a situation similar to that of a passenger. The case in hand on the facts is, as we think, unlike such a situation.

The Amedon Case is one similar to the Banderob Case, one where Amedon had gone to the railway station to meet an expected passenger and while on the premises fell down an uncovered coalhole and was injured; and where it was held the company owed him the duty to keep the premises in a reasonably safe condition. Again the question of contributory negligence seemingly was not involved. Other cases are cited by the appellant, in some where it is merely held that the railroad company owed a duty to invitees and others rightfully about depot premises and grounds to use reasonable and ordinary care for their safety, concerning which there is no substantial dispute; in others where the injured person was either a passenger or an intended passenger or was at and about the depot premises to meet passengers or see them off, or where the doctrine of last clear chance was applied, which doctrine was not in the court below nor here urged or invoked, nor was the case tried upon any such theory.

In the case of *Chattanooga, R. & S. R. Co.* v. *Downs* (C. C. A.) 106 F. 641, it was held that a failure of an invitee to look and listen in crossing railroad tracks in and about depot or station premises was per se negligence, and that the rule announced as to a passenger in and about depot premises in the case of *Warner* v. *Baltimore & O. Railway Company*, supra, was not applicable.

On the other hand it is contended by the respondent that the same duty to look and listen was imposed upon the minor as is imposed on a traveler at a crossing of a railroad track on a public street or highway, and as announced by the cases of *Wilkinson* v. *Oregon S. L. R. Co.*, 35 Utah 110, 99 P. 466; *Lawrence* v. *Denver & Rio G. R. Co.*, 52 Utah 414, 174 P. 817; *Bates* v. *San Pedro, L. A. & S. L. R. Co.*, 38 Utah 568, 114 P. 527; *Butler* v. *Payne*, 59 Utah 383, 203 P. 869, and *Teakle* v. *San Pedro, L. A. & S. L. R. Co.*, 32 Utah 276, 90 P. 402, 10 L. R. A. (N. S.) 486, where it in substance is held that a traveler in approaching and attempting to drive over a railroad crossing without looking and listening for approaching engines and trains is guilty of negligence as matter of law, barring recovery for an injury sustained by him through a collision at the crossing; that the minor was a mere licensee who, as such, used the company's premises for his own convenience and purpose, and though he did so with the knowledge or implied consent of the company, yet the making of such use by him was largely at his peril, and while the company in the operation of its engines and trains about the station and grounds owed him a duty, yet not that owing a passenger or intended passenger, or an invitee engaged in business in which the company and the invitee were mutually interested, and, whether a licensee or an invitee, the failure of the minor to look and listen in approaching the crossing, and before attempting to cross, was per se negligence. We have already indicated that the minor was rightfully about the station premises of the railway company as an invitee and under circumstances where his presence was occasioned in the conduct of busi-

ness which inured to the mutual aid and benefit of both, and that the company owed him the duty to use reasonable and ordinary care in observing a lookout and in giving warnings of the approach of the train.

Though the minor was such an invitee, yet he was required to exercise reasonable and ordinary care for his own safety commensurate with the surroundings and attending dangers. He was familiar with the premises and old enough and sufficiently experienced to comprehend and appreciate the dangers attending the surroundings. His own testimony fairly shows that. Indeed, no point is made by the appellant that the minor because of his age or inexperience was not either in law or in fact required to exercise that degree of care and caution ordinarily expected or required to be exercised by an adult in the same or in a similar situation. Nor, as already observed, was the doctrine of last clear chance invoked either in the court below or here, that the operatives of the train in approaching the crossing in question in the exercise of reasonable and ordinary care could or ought to have discovered, in time to have avoided the accident, a situation, if such was the case, where the minor apparently was unaware or oblivious of the approaching train or in a perilous situation. With such questions eliminated, had the minor as an ordinary traveler driving a motor vehicle and approaching a crossing of a railroad track on a public highway, with a clear view in both directions of an approaching train and attempting to drive over the crossing without looking or listening, we, on the record and because of prior decisions of this court, would be required to hold he was guilty of negligence as matter of law. That apparently is not disputed. Though the crossing was not on a public street or a public highway maintained by the public, but one on grounds owned, occupied, and maintained by the company for railroad purposes and for those having business with the company, yet the minor was in a situation unlike that of a passenger or of an intended passenger at and about the depot or railway station crossing tracks in

going to and from trains or of those at and about the depot or railway station under similar circumstances. He was driving a truck about the station grounds, and approached and was about to drive over a crossing of the main track or line on which he knew there might be a train approaching. He in effect so testified. Though he had the right to assume operatives of a train in approaching the depot and in operating engines and cars in and about the premises would give timely warning of their approach, yet that did not relieve him from himself exercising reasonable and ordinary care for his own safety and protection. Even a passenger or an intended passenger, on the assumption that a railroad company will so operate its trains and cars as not to put him in peril, may not even at a depot or station grounds, without the exercise of some degree of care or caution, put or thrust himself in danger of being struck by moving engines and cars and escape the charge of contributory negligence; and in a given case, his want of care may be so heedless as to constitute per se negligence, while in other cases, the question may be one of fact. The crossing in question though it be considered not a public crossing, for the use and benefit of the public generally, yet was one with equally attending dangers and perils in approaching it with a motor vehicle and in attempting to drive over it with knowledge that a train might be approaching.

Hence, the reason which led to judicial promulgations of the look and listen rule as to railroad crossings generally, which in this as in most jurisdictions has become a rule of law and not a mere rule of evidence, may, if not to a full at least to a large extent, apply to the case in hand, because of the equally attending dangers.

It, however, is urged that the rule applicable to a traveler at a crossing, a stranger to the company, should not in all its strictness be applied to an invitee about depot or station premises of the company. There is good authority that the same rule applies to the one as to the other. *Chattanooga,*

*R. & S. R. Co.* v. *Downs,* supra; *Bursiel* v. *Boston & M. R. R.,* 82 N. H. 363, 134 A. 40; *Southern R. Co.* v. *Bailey,* 110 Va. 833, 67 S. E. 365, 27 L. R. A. (N. S.) 379; *Higgins* v. *Erie R. Co.,* 89 N. J. Law, 629, 99 A. 98; *Tanner* v. *Missouri Pac. R. Co.,* 161 Mo. 497, 61 S. W. 826; *Martyn* v. *N. Y. & Boston Despatch Exp. Co.,* 176 Mass. 401, 57 N. E. 671; *Texas Co.* v. *Washington, B. & A. Elec. R. Co.,* 147 Md. 167, 127 A. 752, 40 A. L. R. 495.

The duty which a company owes to both is the use of reasonable and ordinary care in observing an outlook and in giving timely warning of the approach of a train or cars. The traveler (3 Elliott [3d Ed.] § 652) who approaches the crossing has the right to assume that the company will give the usual signals of the approach, when he can neither hear nor see signs of a moving train, that the crossing may be made safely; and so may an invitee about premises of the company, but such assumption does not relieve either from the duty to use his senses to avoid danger.

However, though it be considered that the minor as an invitee had the right to assume, as shown by some of the authorities, that operatives in approaching the depot or in operating in and about depot and station premises, would observe a reasonable lookout and give timely warning of their approach and because of such assumption he, to some extent, had the right to regulate his conduct accordingly and thus in looking and listening for approaching trains and cars was not required to exercise that amount or degree of vigilance in looking and listening as is required of a traveler generally in approaching and attempting to drive over railroad crossings where trains may momentarily or at any time be expected, still, the minor, in law, could not absolve himself entirely from the duty to look and listen and wholly rely on operatives of trains and cars to protect him. And where a driver of a motor vehicle, though an invitee, under circumstances as disclosed by the record, in turning and approaching a crossing over a main line or rail-

road track on premises of the company, and upon which he knew a train might be expected, and attempts to drive over the crossing without looking or listening and drives immediately in front of a moving train, when but to look—merely to glance—in the direction from which the train was approaching, he readily could have discovered it and avoided the collision, may not, in law, escape the charge of per se negligence. The same result follows though the matter be considered from the viewpoint of a rule of evidence, for that, measuring the acts and conduct of the minor in such particular as that of an adult, reasonable minds may not well differ that such conduct in fact constitutes negligence.

In saying that we are not unmindful of the testimony of the minor that in making the turn he was looking to the west and towards the rear of the truck to see that it did not strike the platform, and for that reason did not see the approaching train from the south. But that in law cannot relieve or excuse him from but having glanced towards the south, the direction from which the train approached, knowing that "the beet run was on and that it (the train) might move along the track" over which he was about to cross.

Having reached the conclusion that the verdict was properly directed on the ground upon which it was directed, it is unnecessary to express an opinion as to whether the minor was driving the truck upon a "highway of this state" in violation of the pleaded statute, or, if so, whether such violation, though negligence per se, was a proximate and contributing cause of the collision.

It thus follows that the judgment of the court below must be affirmed at the cost of both appellants.

ELIAS HANSEN, FOLLAND, EPHRAIM HANSON, and MOFFAT, JJ., concur.